Good morning, Your Honors. May it please the Court, my name is Michael Lewis. I'm from the Law Firm of Rathion and Pignatelli in Concord, NH. If I may, Your Honor, I'd like to reserve three minutes for rebuttal. Yes, you may have it. Thank you, Your Honor. Your Honor, this case must be remanded under your decision in the Caballero case. Specifically, you ruled that a taxpayer cannot be forced by a U.S. tax court decision to pay a deficiency that is in error. Indeed, in that case, the deficiency was only arguably in error, and yet this Court remanded to the tax court to determine the correct deficiency rather than merely just apply a deficiency that... Okay, let's suppose we disagree with you on your reading of that case. Can we get to the underlying issues here, please? Yes, Your Honor. We can. I mean, there are two separate issues other than the burden of proof issues. I thought there were three. Excuse me, I'm sorry, Your Honor. Three burden of proof issues. Okay, go ahead. In terms of burden of proof issues? No. We've got the notice of deficiency as to the reasonable compensation. We have the notice of deficiency about the cost of goods sold, and then we have the penalty provision. Yes, Your Honor. Okay. So in regard to the reasonable compensation issue, the basis of the decision rests on a manifestly unqualified witness. A witness who the IRS itself sought to exclude from trial on the ground that the witness had no personal knowledge and his testimony was hearsay. It was only after there was an intermediate hearing before the tax court that the IRS reversed course, never designating the witness, Wojcik, as an expert, and sought to introduce him at trial. And the trial record is very clear. His testimony was unreliable, should not have been relied upon by the tax court for rendering her decision in this case. I understand the IRS at some point tried to disavow his testimony, but did you file a motion to strike his testimony? Yes, orally. Orally, right after I was able to cross-examine him regarding his testimony, in which he had switched his position regarding the basis for his analysis. And after I had sussed out what types of communications he had engaged in between the deposition I took of him, the notice of deficiency, and the hearing, I... Okay, but the basis of the motion was not addressed to whether he was an expert witness, but addressed to the change in what he was saying? No, the basis of the oral motion in the record was addressed to his qualifications to testify as a witness in the case. He had not been designated as an expert witness. He was giving opinion testimony. He had not analyzed... Okay, we'll take a look.  In regard to the cost of goods sold issue, the tax court concluded that the evidentiary basis for her decision, which was an acceptance of gross profit percentage of 75%, was not the correct result. It's in the tax court's decision, which is located at Addendum 22, where the tax court states, We are not persuaded that Petitioner realized an average 75% gross profit on all sales of surplus parts. The tax court identifies the basis for any assertion of the contrary two sentences later by saying, Exaggerated or false representations to a prospective purchaser may indicate a lack of trustworthiness, but they are not proof of facts. So the tax court directly rejects... That was in the first opinion, right? Yes, Your Honor. And then in the second opinion, what does the tax court say about that issue? In the second opinion, the tax court says, Still, it is not able to identify any inventory value between $27 million and $100 million that it could set for the taxpayer. It never refutes its conclusion that 75% is not sustainable or realistic or position or even based on credible evidence in the case. And doesn't the tax court go on to say, And the reason that there's no better information has to do with the taxpayer's failure to perform evaluations or keep records. Yes. And since the tax court believed you had the burden of proof, you failed the burden of proof, and she accepted the commissioner's determination as not unreasonable. That is the tax court's decision. And that is why when I briefed the burden of proof issue, I raised one of the very clear holdings that led to a remand in Cavallaro, which found that even having rejected evaluation as arguably flawed that was offered by Bella, the first circuit still remanded because it was not going to rest a conclusion regarding inefficiency based on an incorrect result. What purpose would a remand serve after the tax court has said the taxpayer simply didn't keep enough records to make an accurate determination? What's going to be different the next time around? There should be an instruction that the tax court cannot just merely accept 75% from evidence that is not credible, but must look further, must do, for instance, what? Do what? Right. So, for instance, do what the court did in the Olive case that we cite, which is listen to information about industry accomplishment, which is what happened in that case. Yes, Your Honor. Go ahead. There was testimony about the absence of records for a marijuana dispensary in California because it was a cash business, and the tax court reconstructed cost of goods sold by accepting estimation testimony from an accountant by two accountants. You had your chance to put on expert testimony. The tax court rejected that expert testimony. Why do you get a second bite at the apple? Because the tax court rejected expert testimony and instead chose to base its conclusion on manifestly false evidence, which it had rejected. Can I try something out, just so I see if I follow your argument and what might be at stake? Did you? Okay. I take it if the government came in and had a reasonable basis for saying that there was a deficiency, but then said, and here's what we think the amount of deficiency is, it's based on, instead of 75%, 99%. And then if you ask, well, why did you choose 99%? They said, I felt like it. You would say, well, that can't stand, right? And you're saying effectively that's the same situation here, because the tax court in the first ruling said 75% makes no sense. So there's got to be a remand, even if there's a deficiency, to figure out the extent or magnitude of the deficiency, and that's got to be based on something real. Yes, sir. Is that the argument? It's one of the arguments. With respect to that issue? Yes, but it's one of the arguments. Just sticking, before you get to your other argument, just sticking with this argument. Yes. One potential problem with that argument, if I'm following the two opinions, because they're not obviously easy to reconcile. The first opinion is trying to make a ruling on whether there's fraud. The second ruling is not trying to make a ruling on whether there's fraud. So it's at least possible that what the tax court was saying is there is no showing of fraud. In the course of that, they said we don't get where this 75% thing is. Now we come back and we're deciding what's the extent of the deficiency, and they say, look, we're no longer trying to figure out whether you're acting fraudulently or not. We're just trying to figure out whether there was a deficiency and how much it was. And you haven't given us any basis for figuring out how much it would be, because you haven't kept any inventory. But the record does show that you were representing to investors that 75% was a good figure. So absent anything else, how can we say it's unreasonable for the IRS to take the exact same figure that you were using to your investors? So one reason is because the court, in the very beginning of its first order, talks about the amount of evidence that was presented that underlay its initial observations and then talks about what was to come next. So in the first five days of trial, there were 135 exhibits, including the evidence, the only evidence supporting 75% in the case. 400 pages of briefing then happened. And the court said all there is, after hearing it and deciding there was no fraud, all there is left over to determine is what's the cost of goods sold and what's the reasonable compensation for the open years. And the only evidence that was presented after that point was evidence that further impeached the 75% figure. It was data that the IRS's own expert had relied on that indicated how out of sync 75% would be with the industry accomplishment. And it was the testimony of Michael Thompson, which, however flawed, aligned with Agent Canale's matching analysis, which showed that no one could ever do a forensic analysis that ever got anywhere close to 75%. What numbers does it equate to? I don't think you, you don't posit what their evidence would yield as a percentage. No better than 55%. How can you square that with the fact that the, you're not, are you saying that there was no evidence of a deficiency then? Or are you just claiming that 75% was wrong? 75% was wrong. That means you're saying that the evidence was sufficient to show a deficiency of some sort. Would 55% show a deficiency? It wouldn't, because you guys were, had cost of goods at 60% all throughout. Your own numbers show that it was 60%, right? 55% would be the gross profit percentage, and then 45% would be the cost of goods sold percentage. So, the IRS's position was, I see them at a time, the IRS's position was a 75% gross profit percentage. Their own matching analysis, which was conducted to cover the holes in their audit, between the audit and the trial, yielded no better than 56%. So, as soon as they actually looked at the records and they found... But when you filed your taxes, weren't you always listing more than 55%? Yes. So, that would suggest there was no deficiency at all. But you're not arguing to us there was no deficiency. I thought you were arguing that the magnitude of it was wrong, because the 75% figure was wrong. I've made multiple arguments in my brief. I'm focusing on what I think is the strongest point, which is this... It just goes to what would happen on remand. I'm just trying to figure out what would... You'd be finding that there is a sufficiency. You'd send it back to remand for them to figure out the amount of it. Your position is the amount of it should be that there's no deficiency. So, I just don't quite get what's going to happen. There are numerous potential approaches that might be taken on a remand to determine a proper ending inventory for 2007. Thank you, Your Honor. Good morning. May I please the Court? I'm Anthony Sheehan. I represent the Commissioner of Internal Revenue. TransSupport is a New Hampshire business that, from 2006 through 2008, had sales in excess of $32 million, but due to its arbitrary and excessive cost of goods sold and compensation deductions, reported taxable income of less than $86,000 and federal income taxes of less than $13,000. The taxpayer bore the burden of proof on showing that it was entitled to deductions in excess of what was in the notice of deficiency. The tax court sorted through this large, complex, and often ambiguous record and found that the taxpayer had not borne its burden of proof. That finding is not clearly erroneous and it should be affirmed. Suppose the government had come in and said it's 99%. Would you win?  And if your reason for choosing 99% was that you felt like it, you'd still win? What would be the sense of letting the government have that kind of authority? And since anybody who makes the mistake of not making themselves in a position to know what their inventory was is subject to having the government choose any percentage it chooses? And necessarily will lose? That can't be right. The government, as shown by this case, will do its best to try to carefully go through and come up with reasonable numbers. So the number you killed was 75%, so why is it reasonable? It's reasonable for several reasons. First of all, it's the number that TransSupport actually used when making representations to its investors. In the author materials, in Harold Foote's conversations with these investors, it's their number. What about the fact that the tax court said that there's no reason anybody would believe that? That can't be the right number. Because that number also, that is a representation by them. And the other evidence would also go, would also show. Okay, I thought in part your argument was that round one was about whether the IRS had shown fraud. Because if it did show fraud, it could reach 10 years it couldn't otherwise reach. And only in that context were the comments made that the 75% figure, in essence, didn't show fraud. Round two is not about fraud. It is about the notice of deficiency and whose position the tax court is actually going to take. Have you abandoned that argument? No, we have not abandoned that argument. All right, so now I'd like you to address his argument that in round two, there was no additional evidence whatsoever that would have supported the 75% figure. And then after we deal with that issue, I'd like you to go to Judge Barron's question, which was also my question. So if we remanded, what would happen on remand? Okay? Okay. So first, round two, what's the additional evidence? In round two, we did have the expert testimony that was rejected. But again, as the court has pointed out, round two also dealt with a different burden of proof. The first round had to deal with the commissioner proving an underpayment by clear and convincing evidence. Round two had to deal with the taxpayer's burden to prove by a preponderance of the evidence that the actual deduction to which it was entitled, to come forward with actual evidence from its own records to say, yes, this is the figure. The question was, what evidence is there to support the 75%? I understand the argument about burden of proof, but on the question on round two, what evidence is there to support the 75%? What evidence is there other than the expert testimony that was rejected? In round two, there was nothing beyond the expert testimony that was rejected, but there was, we believe, sufficient evidence in round one to show that that 75% figure was not clearly erroneous, upholding it was not clearly erroneous. We're also going beyond taxpayers' own representations in the marketing material. We go through, there's a direct relationship between cost of goods sold and inventory. And we have the inventory, we have the Honeywell list coming from the top down, which we did in our brief. You go through all the numbers, and there's widely divergent numbers as to, from taxpayers' records and from their testimony. We trace through it, and you cannot show an inventory anywhere near the 1.8 million they claimed for 2007. And how does that support 75%? It supports 75% because if you look at the 75% figure for gross profit, it produces on the IRS's figures an inventory of around 27 million. Well, the marketing materials, they were claiming an inventory cost of 100 million. So it's well below that, and if you try to trace through the inventory figures, 27 million turns out to be a fairly sensible and reasonable number given everything that's going on. There's evidence that supports that, the 27 million, so that we could reason it out that way?  In our brief, we went through, took the top line number on their Honeywell inventory list and tried to discount it down. Now, I know Mr. Lewis has complained about the government's numbers being wildly divergent. It's because the taxpayers' records are wildly divergent. We just did the math, and we came up with numbers that would show that 27 million is possibly a low ball. Also, counsel to the commissioner at trial worked with Harold Foote and tried to work up from the base. You've got this part, you've got this part in there. She stopped at 4 million, which was well in excess of what they had reported on their returns. And then there was an analysis of trying to cost out parts that came up with 11 million probably, and those are just the parts that could be costed out. And the Honeywell list, according to testimony by Harold Foote and the Sons, is maybe, I think, I forgot, like 30% of the total amount they have in inventory. Did the tax court rely on any of that evidence in making its finding? That you're asking us to say is not clearly one, yes? I'm trying to... The tax court found certainly that the inventory amounts on their returns could not be sustained, and it found that... Did it rely on it for support, I'm sorry, for supporting the 75%? Didn't it refer to the Honeywell list? I don't recall exactly off the top of my head. It would be in the court's opinion. I just don't recall it relying on it for purpose of defending the 75% figure in the way that you're now doing. Commissioner, it is as the apathy is entitled to seek a firm and sound ground supported by the record, and we think that this ground is supported by the record, even if... And I'm sorry, I just can't recall off the top of my head. Doesn't your argument ultimately boil down to the fact that they didn't put in anything which would show what the real cost of goods sold was? They had this offering memorandum which set forth a number, and since they didn't do anything else, you could latch on to that number, and that was good enough. Isn't that basically your theory? Because you didn't put on any number, any evidence, at least as far as I could tell, which substantiated that number. I'm sorry, Your Honor, but it's not the burden of the Commissioner to substantiate that. I understand, but don't you have some... It can't just come out of, as Judge Barron said earlier, it just can't come out of thin air. It didn't come out of thin air. That was the marketing number they used. That's the answer to Judge Sull's question. Now you're saying that your reason for 75% is you're relying on their marketing representation. We're relying on that, also, that representation was made to Agent Canale during the audit. Also, if you look at Harold Foote's testimony at trial, he said we make 75% on a goodly number of sales, more on some, less on others. But if they made more on some and less on others, you're saying that that testimony reasonably says that 75 was an average and it's a fair average. It's a fair average for the cost of goods actually sold. Now, in this record, there's also evidence in the correlation that they were trying to deduct everything they purchased, which is completely improper. There's a strong correlation between the cost of goods sold and their purchasing records. The logic of what you're saying, to me, has a lot of force. If the tax court hadn't earlier so trashed the idea that 75% was a plausible number. If we go back on remand, which I think is Judge Lynch's last question to me, to just look at these same figures again, we're still stuck with the fact that there were no inventory records. Indeed, the gross profit method they claim to use, if you look at the accounting textbooks in the record, especially at page 2010, that accounting textbook actually says that companies must take a physical inventory once a year to verify the inventory even under the gross profit method. We still have to go through what we have. What we have are inventory. What we have are the Honeywell list. This often happens in our legal system, which is if the tax court, based on the Honeywell list and the other evidence, could come to a 75% figure and say that it's reasonable, then you'd win. But as it is now, the thing that's just somewhat uncomfortable is you want to win on the ground that there was a representation in the marketing materials of 75%. And we're saying that's a reasonable thing to rely on, notwithstanding the tax court earlier having said no one could possibly believe it. That's a strange situation, right? So doesn't remand solve that? And if you have a good argument for 75% based on the other evidence, or even you could say it bolsters it so the tax court could say, now on reflection I see there's more force to the representation of 75% than my earlier opinion said, then everybody would have a finding that was based on something rather than what seems a little bit arbitrary here. I understand the court's discomfort. We did try in our brief to trace through what records we had, what inventory records we had, the Honeywell list, to try to use their figures to show, because of the direct relationship between cost of goods sold and ending inventory, that the 75% produced an ending inventory amount that is in line with other information in the record. We're not trying to just say it's right now. But there's nothing in the record itself, if I go and look at the record and try to read the record, that puts any flesh around that 75% figure other than the representation in the offering papers. And we all know that there's often puffery in offering papers. You put the best face you can on maybe a pig to make the pig look better. Now, I think if you're correct, all this means is that when the taxpayer doesn't carry its burden, we can use any number we feel like. I understood your argument to be, if there's any basis in the record to sustain the tax court, then this court must sustain the tax court and that the evidence is not restricted to that 75% figure. It also includes the Honeywell list. It includes estimates about the value of the inventory. And, indeed, the suggestion was the commissioner's position, if it is an error, is an error on the low side when you consider all of the evidence. Yes, and the IRS is not trying to be arbitrary or unreasonable. I understand the discomfort you would have with the 99% figure you threw out of that hypothetical. But, yes, we would submit judgments that, if you look at the totality of the evidence that we have parsed through, that there is support for the 75% figure. Can I just ask how that works on clear error review of a factual finding? I understand that we can affirm any ground that's legal ground, even if the tax court didn't come up with it. I also can't say if it's manifest in the record, how am I able to. But here, manifest is not the word that's leaping to mind when I think about the record. If the idea is that we could sift through the record and work back from the Honeywell list to see that the 75% figure is reasonable, even though the tax court didn't seem to do that. If the tax court did it, and we'd be affirming on that ground, that's one thing. If the tax court didn't do that, and instead just adopted the representation to the investors as the basis for the 75% figure. That is what we endeavored to do in our brief. I could also point out how it puts testimony. I could also point out other things. But we did endeavor to do that work and not put the burden on this court to trace through, to do the math to show that this figure is a reasonable figure. And so this isn't like the 99% case? No, I would hope it's not just picked out of the air. No, it's not picked out of the air. There's a reason why it showed up in the notice of deficiency. And we believe that if you actually go through the record and look at the relationships it supports, I would hope to never have to defend any kind of arbitrary thing just on grounds like burden of proof. Can I ask you one other question? Because you didn't really answer my question. I'm sorry, Your Honor. If the offering circular had said 65%, would you have then thought it was appropriate to have 65%? There has to be a number, Your Honor, and certainly taking a number the taxpayer has... So it goes back to the question I originally asked you. Basically, failing everything else, you took the taxpayer's number out of the offering circular. Yes, that number also given to Agent Canale was what was put in the notice of deficiency, but then the taxpayer had a de novo opportunity before the tax court to show it's wrong. I thank the court for its time. I'd like to make three points in rebuttal. The first point is that the tax court had a seamless fact-finding experience between the two orders, and we know that because the tax court incorporates by reference its first opinion to its second. So there was not necessarily a round one and a round two. The second point I'd like to make is that the tax court itself didn't believe that 75% is the right figure, and we know that for a couple of reasons. First, you've never heard of a company in the world where its employees were so denigrated by a tax court decision but nevertheless were able to achieve 75% margins in a junk metal part business like this. If these guys, in fact, at TransSupport achieve 75% margins, they are not medium performers. They are amazing performers, and they exceeded the data regarding industry averages by many multiples. There's no way that this decision could be affirmed on both sides based on a rule of reason. Moreover, I think it's very important for the court to understand that there was very strong evidence in this case supporting the taxpayer's position on cost of goods sold. And I would specifically ask the court to look at a joint appendix record 657, which is a chart which indicates the historic sales and purchases of this company over a 20-year period, and then, in conjunction with that, lead the testimony of Jeff Foote, the chief financial officer of the company, and the company's accountant, which they're at 371 to 380 and 406 to 409. And you'll see the foundation for this exhibit. What this exhibit shows is that over a 20-year period, this company achieved gross profits of about 30%, which is in line with what it reported, which is in line with how you're supposed to apply the gross profit method under the definition and how it's described in the textbook. Moreover, when you look at the textbook citations, you will see that the gross profit method is applied, assumes no physical inventory, and does not require a taxpayer to take one. So the representation of the contrary, I mean, it's just not consistent with the law. It's certainly not consistent with the IRS's own auditor, Joseph Polzella, who testified at this trial. His work papers are part of the record. And those work papers indicate an acknowledgment that in this type of business, a physical inventory is just not possible. I'd also ask the court to review the Siebel decision, the Fourth Circuit case, also analyzing this method of accounting, also recognizing a physical inventory is not possible, and remanding for a correct result. Thank you, Your Honor, for your time. This has been a pleasure.